# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| DISTRICT NO. 1, PACIFIC COAST DISTRICT, MARINE ENGINEERS' BENEFICIAL ASSOCIATION, AFL-CIO, | ) ) ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 11-cv-1795 (KBJ) |
| LIBERTY MARITIME CORP., | ) ) | |
| Defendant. | ) ) ) | |

## <u>MEMORANDUM OPINION</u>

Plaintiff District No. 1, Pacific Coast District, Marine Engineers' Beneficial Association, AFL-CIO ("Plaintiff," "MEBA" or "the Union"), is a labor organization headquartered in the District of Columbia that represents maritime industry employees working at ports throughout the United States. For more than 20 years, MEBA engaged in a collective bargaining relationship with Defendant Liberty Maritime Corp. ("Liberty," "Defendant," or "the Company"), a shipping management company that employed MEBA-represented individuals in supervisory positions aboard Liberty-operated vessels pursuant to successive contracts with the Union. The parties' relationship soured in the fall of 2011, when MEBA and Liberty failed to negotiate a successor agreement for the first time since the Company's founding in 1988, and Liberty subsequently entered into a new collective bargaining agreement with one of MEBA's rival unions, the American Maritime Officers ("AMO"). MEBA has brought the instant action against Liberty pursuant to section 301 of the Labor Management

Relations Act, 29 U.S.C. § 185, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202, alleging that the last successfully negotiated agreement between the parties—which includes an arbitration provision—remains in effect, and that Liberty breached this agreement. Accordingly, MEBA seeks an order from this Court compelling Liberty to arbitrate what MEBA contends is a contractual dispute. (*See* Compl., ECF No. 1, ¶¶ 1-3, 29-30, 32-33, 37.)

Before this Court at present are both parties' cross-motions for summary judgment. (*See* Pl.'s Mot. for Summ. J. ("Pl.'s Mot."), ECF No. 26; Def.'s Mot. for Summ. J. ("Def.'s Mot."), ECF No. 27.) MEBA contends that it is entitled to an order compelling arbitration as a matter of law. (*See* Pl.'s Mem. in Supp. of Pl.'s Mot. ("Pl.'s Br."), ECF No. 26-4, at 11.)[1] Liberty, in contrast, asserts that this Court lacks subject matter jurisdiction over the instant dispute because the gravamen of MEBA's claim is "representational"—*i.e.*, the aim of the Union's suit is to force Liberty to employ supervisors represented by MEBA and not by AMO—and, Liberty argues, only the National Labor Relations Board ("NLRB") may hear this type of claim. (*See* Def.'s Statement of Facts & Mem. in Supp. of Def.'s Mot. ("Def.'s Br."), ECF No. 27-1, at 7.) Moreover and in any event, Liberty argues that this Court cannot compel the parties to arbitrate under their last successfully negotiated agreement because that agreement was no longer in place at the time of the alleged violations. (*See id.* at 7-8.)

Because this Court concludes that it has jurisdiction to hear MEBA's claims, and that the question of whether the parties' labor agreement was still in effect at the time of the alleged violations is a question for an arbitrator to decide, this Court will **DENY**

---

[1] Page numbers throughout this Opinion—except for deposition page numbers—refer to those that the Court's electronic filing system assigns.

Defendant's motion for summary judgment, **GRANT** Plaintiff's motion for summary judgment, and compel the parties to arbitrate. A separate order consistent with this memorandum opinion will follow.

## I.  BACKGROUND

### A.  Legal Landscape

The dispute in this case is grounded in the complex statutory and legal framework governing labor law, including the National Labor Relations Act of 1935 ("NLRA"), 29 U.S.C. §§ 151-169, and the Labor Management Relations Act of 1947 ("LMRA"), 29 U.S.C. § 141 et seq., also known as the Taft-Hartley Act, which was enacted as a series of amendments to the NLRA. *See Int'l Longshoremen's Ass'n v. NLRB*, 56 F.3d 205, 207 (D.C. Cir. 1995) ("Congress amended the NLRA with the enactment of the Labor Management Relations Act." (citation omitted)). Central to the instant case are section 301 of the LMRA, 29 U.S.C. § 185, which grants federal courts jurisdiction over suits for labor contract violations, and section 8 of the NLRA, 29 U.S.C. § 158, which governs unfair labor practices over which the NLRB has primary jurisdiction. Specifically, section 301 provides that

> [s]uits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C. § 185(a). The Supreme Court has recognized that section 301 "does more than confer jurisdiction in the federal courts over labor organizations[,]" the statute also "expresses a federal policy that federal courts should enforce" labor contracts, including "agreement[s] to arbitrate grievance disputes" in order to promote stability in

the labor industry or, as the Court put it, to ensure "industrial peace[.]" *Textile Workers Union v. Lincoln Mills*, 353 U.S. 448, 455 (1957); *see also Local Union 1395, Int'l Bhd. of Elec. Workers v. NLRB*, 797 F.2d 1027, 1030 (D.C. Cir. 1986) ("Congress has authorized the courts independently to entertain suits brought to enforce collective bargaining agreements under Section 301 of the Labor-Management Relations Act[.]" (citing *Lincoln Mills*, 353 U.S. at 456-457)); Lee Modjeska et al., Federal Labor Law: NLRB Practice 25 (Feb. 2014 ed.) (explaining that section 301 "reflect[s] Congress'[s] intent to encourage and support the private arbitration of disputes arising under collective bargaining agreements, and to make arbitration agreements judicially enforceable" (footnote omitted)).

Section 8 of the NLRA, meanwhile, describes a host of "representational" issues, *Carey v. Westinghouse Elec. Corp.*, 375 U.S. 261, 266 (1964), that may arise in the context of collective bargaining—including unfair labor practices related to employers, employees, and their respective representatives, *see* 29 U.S.C. § 158—and, in contrast to section 301 claims, "courts are not primary tribunals to adjudicate [section 8] issues[,]" *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 244 (1959). For example, section 8(b)(1)(B) makes it an unfair labor practice for a union or its agents "to restrain or coerce" an "employer in the selection of [its] representatives for the purposes of collective bargaining[.]" 29 U.S.C. § 158(b)(1)(B). By the same token, it is an unfair labor practice under section 8(a)(5) for an employer "to refuse to bargain collectively with the representatives of [its] employees[.]" *Id.* § 158(a)(5). Indeed, under section 8(d), employers and representatives of their employees have a "mutual obligation" or "duty" to bargain collectively, *id* § 158(d), but it is well settled, that "it

[is] an employer's duty to bargain collectively only with the duly recognized or accredited representative of the employees[,]" *May Dep't Stores Co. v. NLRB*, 326 U.S. 376, 383-384 (1945). Determinations such as who qualifies as a duly recognized representative for the purpose of section 8 are "left in the first instance to the National Labor Relations Board[,]" which has authority to prevent and remedy unfair labor practices, and not to the courts. *Garmon*, 359 U.S. at 244-245; *see also* 29 U.S.C. § 160 (describing Board's powers and procedures regarding unfair labor practices); Modjeska, *supra*, at 44-65 (describing unfair labor practice procedures).

### B. Factual Background

The instant dispute arises out of the parties' lengthy collective bargaining relationship. In particular, this case concerns the parties' most recent successful labor agreement (in 2010) and their failed attempts to negotiate a successor agreement in 2011.

### 1. The Parties' History Of Collective Bargaining And Most Recent Successful Labor Agreement

MEBA is a labor organization that represents U.S. maritime industry employees including licensed deck officers and engineers. (Decl. of Mike Jewell, President of MEBA ("Jewell Decl."), ECF No. 26-2, ¶ 2; *see also* Dep. of Thomas Keenan, Exec. Vice President of Liberty ("Keenan Dep."), ECF No. 27-4, at 23:18-21.) Liberty is a corporation that manages a fleet of commercial shipping vessels—including "bulk carriers" and "pure car truck carriers"—that transport goods around the world. (Keenan Dep. at 19:14-20:8 (describing Liberty's ships); *id.* at 14:3-21 (describing Liberty's business activities); Jewell Decl. ¶ 3 (same).) For more than 20 years, Liberty and MEBA engaged in a collective bargaining relationship through which Liberty employed

MEBA-represented engineers aboard Liberty-operated bulk carriers.  (Jewell Decl. ¶ 4;

Keenan Dep. at 14:22-15:1, 26:9-12; *see also* E-mail from Philip Shapiro, President &

CEO of Liberty, to Jewell (Sept. 29, 2011, 4:08 p.m.) ("Sept. 29th Shapiro E-mail"),

ECF No. 27-20, at 2 ("Our company has been an MEBA contracted company since its

founding in 1988.").)  Specifically, since 1988 the parties had entered into successive

collective bargaining agreements ("CBAs") that set the terms and conditions of

employment for MEBA members employed by Liberty.

In August of 2010, instead of negotiating a new CBA, the parties signed a

Memorandum of Understanding ("MOU") agreeing to a one-year extension of the

existing CBA terms which, along with amendments in the MOU itself, the parties

"deemed a New Agreement[.]"  (MOU, ECF No. 26-2 at 11-16, 11.)  Specifically, the

parties agreed in a provision of the MOU entitled "Duration of the Agreement" that this

"New Agreement" would be effective from August 25, 2010, through midnight on

September 30, 2011.  (*Id.*)  The parties further stipulated in the duration provision that

the New Agreement would automatically renew itself

> from year to year thereafter unless either the Company or the
> Union shall give written notice to the other of its desire to
> amend the Agreement, which shall be given at least sixty
> (60) days, but no sooner than ninety (90) days, prior to the
> expiration date.  In the event either the Company or the
> Union serves notice to amend the Agreement, the terms of
> the Agreement in effect at that time of the notice to amend
> shall continue in effect until mutual agreement on the
> proposed amendments or an impasse has been reached.

(*Id.*)

As for the substantive provisions of the prior CBA that the New Agreement

incorporated by reference, at least three are important to the instant dispute.  First, in

the prior CBA, the parties had acknowledged "that all of the engineers to whom this Agreement is applicable are 'supervisors' within the meaning of the Labor Management Relations Act[.]" (District No.1—Pacific Coast District, M.E.B.A. Tanker Agreement ("CBA"), ECF No. 27-2 at 2-7, 6.)[2] Second, Liberty had recognized MEBA "as the sole representative" of the Company's licensed engineers "for the purposes of collective bargaining" (*id.* at 7), and further promised to hire only MEBA-represented engineers, (*id.*). Third, the parties had agreed that "[a]ll disputes relating to the interpretation or performance of this Agreement shall be determined in accordance with" the binding grievance and arbitration procedures set forth at length in the CBA. (CBA, ECF No. 26-2 at 28-35, 30; *see also* Jewell Decl. ¶ 15 (describing grievance and arbitration provisions).) In particular, the CBA provided for the appointment of a mutually agreed upon arbitrator who would chair monthly meetings of a "Licensed Personnel Board consisting of two (2) persons appointed by the Union and two (2) persons appointed by the Company." (CBA, ECF No. 26-2, at 30.) The parties agreed to submit "any grievances that each party may have" to the arbitrator and the personnel board for resolution, and acknowledged that "[t]he decision of a majority of the Board or the Arbitrator . . . shall be final and binding upon the parties[.]" (*Id.* at 30-31.)

2.    The 2011 Negotiations

MEBA officials who participated in the 2011 negotiations with Liberty include: President Mike Jewell, Gulf Coast Vice President Jonathan Lincoln, and Secretary-

---

[2] Supervisors, as defined in section 2(11) of the NLRA, 29 U.S.C. § 152(11), are ordinarily excluded from the NLRA's protections. *See, e.g.*, *NLRB v. Ky. River Cmty. Care, Inc.*, 532 U.S. 706, 708 (2001) (noting that "employees . . . deemed to be 'supervisors' [are] thereby excluded from the protections of the Act"). However, "parties voluntarily may agree to the inclusion of supervisors in a [bargaining] unit" and "[s]uch an agreement is enforceable according to the terms of the collective bargaining agreement in which it is embodied." *U.S. Dep't of Interior v. FLRA*, 26 F.3d 179, 182 (D.C. Cir. 1994) (citing *Allied Chem. & Alkali Workers v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 188 (1971)).

Treasurer Bill Van Loo. (*See* Jewell Decl. ¶ 7 ("On behalf of the Union, I bargained with Liberty[] . . . with the intent to reach a successor agreement to the parties' labor contract."); Dep. of Mike Jewell ("Jewell Dep."), ECF No. 27-8, at 42:20-21 (identifying Lincoln as "chief negotiator"); *id.* at 51:16-19, 55:14-22 (describing Van Loo's involvement in negotiations).) Liberty officials and representatives involved in the negotiations and subsequent grievances include: President and CEO Philip Shapiro, Executive Vice President for Marine Operations Thomas Keenan, Vice President for Operations Capt. David Hussey, and outside counsel William G. Miossi. (*See, e.g.*, E-mail from Shapiro to Jewell (Sept. 28, 2011, 2:18 p.m.) ("Sept. 28th Shapiro E-mail"), ECF No. 27-18, at 2 (negotiating with Jewell); Decl. of Thomas Keenan ("Keenan Decl."), ECF No. 27-17, ¶ 4 ("From July to September, 2011, I oversaw and participated directly in negotiations with [MEBA]."); Letter from Lincoln to Hussey (July 8, 2011) ("July 8th Lincoln Letter"), ECF No. 27-7, at 2 (notifying Hussey of the Union's desire to amend the parties' agreement); Letter from Miossi to Van Loo (Oct. 7, 2011), ECF No. 26-2, at 43-44 (denying MEBA's September 30, 2011 grievance).)

On July 5, 2011, Liberty sent MEBA a letter providing notice of Liberty's "intent to terminate" the parties' New Agreement and of its "availab[ility] to meet with the Union to discuss any issues that are pertinent to this notice." (Letter from Shapiro to Jewell (July 5, 2011), ECF No. 27-6, at 2.) On July 8, 2011, MEBA sent Liberty a letter giving "written notice of its desire to amend the Agreement" pursuant to "Section 1 of the Memorandum of Understanding[.]" (July 8th Lincoln Letter at 2.) In light of these twin notices, as well as the Agreement's potential expiration date on September 30, 2011, the parties met multiple times over the course of the next three months to

8

negotiate the terms of a possible successor agreement. (*See* Keenan Decl. ¶ 4 (negotiations between MEBA and Liberty took place "[f]rom July to September, 2011"); Jewell Decl. ¶¶ 7-8 (describing negotiations).)

Liberty and MEBA were divided on a number of issues, but by all accounts the heart of the parties' disagreement was Liberty's insistence that the Union freeze its defined benefit pension plan, replace it with a defined contribution plan, and make changes with respect to 20 additional issues that the parties refer to as the "20 points." (*See* Keenan Dep. at 47:4-11 (testifying that Liberty repeatedly told MEBA that any successor agreement would have to include a defined contribution plan); *id.* at 82:21-22 (testifying that "any subsequent agreement would have to address the[] 20 points"); *see also* Dep. of Jonathan Lincoln ("Lincoln Dep."), ECF No. 27-3, at 14:6-15:17 (discussing MEBA's understanding of Liberty's positions with respect to the pension plan and the 20 points).)[3] Despite Liberty's insistence, MEBA was reluctant to part with its defined benefit pension plan and did not immediately agree to all 20 points. (*See* Lincoln Dep. at 22:20-22 ("The idea [of] going to a defined contribution plan was not something [MEBA] favored and we opposed that."); *id.* at 24:21-25:4 (testifying that MEBA was willing to "move forward" with "some of" the 20 points).) Indeed, as of the end of August of 2011, MEBA and Liberty had not reached agreement regarding either the pension plan or the 20 points. (*See* Keenan Dep. at 101:4-20, 114:7-15; *see*

---

[3] "A defined-benefit plan, 'as its name implies, is one where the employee, upon retirement, is entitled to a fixed periodic payment.'" *Beck v. PACE Int'l Union*, 551 U.S. 96, 98 (quoting *Commissioner v. Keystone Consol. Indus., Inc.*, 508 U.S. 152, 154 (1993)). "A defined contribution plan[,]" by contrast, "is one where employees and employers may contribute to the plan, and 'the employer's contribution is fixed and the employee receives whatever level of benefits the amount contributed on his behalf will provide.'" *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 439 (1999) (quoting *Nachman Corp. v. Pension Benefit Guaranty Corp.*, 446 U.S. 359, 364 n.5 (1980) (internal quotation marks omitted)).

*also* Lincoln Dep. at 22:10-25:12 (describing MEBA's opposition to switching pension plans and agreement on only some of the 20 points).)

While still negotiating with MEBA, Liberty also met with one of MEBA's rival unions, the AMO. (*See* Keenan Dep. at 186:6-190:17.) According to Liberty's executive vice president, Liberty met with AMO in August of 2011 to discuss the possibility of entering into a new labor agreement with that union instead of with MEBA. (*See id.*) At the meeting, AMO told Liberty that it already had a defined contribution plan in place and was willing to accept the 20 points at issue in the company's negotiations with MEBA. (*Id.* at 187:14-188:17.) Essentially, Liberty walked away from that meeting with the understanding that AMO was willing to enter an agreement with the Company if negotiations with MEBA proved unsuccessful. (*See id.* at 190:11-17 ("[Liberty's] understanding was that [AMO was] interested in our business, no question, and that if we couldn't move forward with the MEBA, they would be willing to take over these positions.").) Although MEBA inquired as to whether Liberty was meeting with other labor organizations, the Company did not tell the Union about its meeting with AMO. (*See* Dep. of William K. Van Loo ("Van Loo Dep."), ECF No. 27-24, at 25:5-8 (testifying that, when asked, Liberty officials denied talking to other labor organizations).)

Liberty and MEBA continued to negotiate both in writing and in person throughout September, but neither side appeared willing to alter its core positions: Liberty still demanded that the Union transition to a defined contribution plan and accept all 20 points, while MEBA steadfastly refused to change pension plans and had yet to address all of the 20 points to Liberty's satisfaction. (*See, e.g.*, Letter from

Keenan to Lincoln (Sept. 13, 2011), ECF No. 27-11, at 2 (listing outstanding issues that the Union must address in writing before Liberty would schedule another in-person meeting); Letter from Lincoln to Keenan (Sept. 15, 2011), ECF No. 27-13, at 2 (noting that the Union rejected the idea of replacing its defined benefit pension plan with a defined contribution plan and sought an extension of the MOU until that issue could be resolved); Letter from Keenan to Lincoln (Sept. 16, 2011), ECF No. 27-14, at 3 (noting Liberty's refusal to sign a new agreement unless MEBA accepted the defined contribution plan and the 20 points).) With September 30th fast approaching, MEBA President Mike Jewell spoke to Liberty officials by phone on September 27, 2011, and stated that the Union continued to oppose the pension plan change. (Jewell Dep. at 48:18-50:9 (testifying that Jewell told Liberty "that MEBA's position was still that we continue to hold fast on a defined benefit [plan]").) In light of this position, Liberty responded that the parties' agreement would expire at midnight on September 30, 2011, pursuant to the MOU and Liberty's July 5th notice. (Jewell Decl. ¶ 9; *see also* E-mail from Keenan to Jewell & Lincoln (Sept. 27, 2011, 7:01 p.m.), ECF No. 27-16 ("As we discussed with you this morning, it appears that Liberty and MEBA will not be able to agree to terms for a new . . . labor agreement.").)

On September 28, 2011, however, Jewell called Liberty again, and this time, informed Liberty's President and CEO Philip Shapiro that MEBA had reversed its earlier position; specifically, Jewell stated that the Union was now willing to switch to a defined contribution plan, that it accepted Liberty's economic proposals, and that it wished to return to the bargaining table. (Jewell Dep. at 51:4-52:21; *see also* Sept. 28th Shapiro E-mail at 2 ("Reference is hereby made to your phone call to me at 2:00pm

today whereby you stated that MEBA is suddenly reversing its previously firmly held position against replacing the [pension plan.]").) In response, Liberty requested that MEBA put all of its positions in writing. (Sept. 28th Shapiro E-mail at 2; *see also* Jewell Dep. at 52:22-53:3.) Jewell then sent an e-mail to Shapiro "confirm[ing] that the MEBA has agreed to accept Liberty's economic proposal as well as its proposal that [the Union] be in a defined contribution plan" and "request[ing] that Liberty and the MEBA get back to the bargaining table and work out" any remaining issues. (E-mail from Jewell to Shapiro (Sept. 28, 2011, 4:23 p.m.), ECF No. 26-2, at 20.)

Liberty, however, was not convinced that MEBA's change in position with respect to the pension plan was sincere. (*See* Sept. 29th Shapiro E-mail at 2 (expressing disbelief at MEBA's "total reversal" when just 24 hours earlier the Union had told Liberty that it "would never be able to crew [Liberty's] vessels without the defined benefit plan and that no one would work for [Liberty] without it"); Keenan Dep. at 175:4-22 (describing Jewell's e-mail of September 28, 2011, and the Union's supposed change of heart as "very disingenuous" and an "unbelievable . . . 180-degree about face against the heart of the MEBA").) Thus, despite MEBA's eleventh hour purported change of heart, Liberty refused the Union's request to resume negotiations. (Jewell Decl. ¶ 12; *see also* Keenan Dep. at 176:10-16 (noting Liberty's refusal to return to the bargaining table).) Instead, Shapiro sent Jewell an e-mail informing him that the Union's "sudden and dramatic" change in position had come "too late"; that the parties' "labor agreement will expire according to its terms on September 30, 2011"; and that Liberty would "not enter into a new [agreement] with MEBA." (Sept. 29th Shapiro E-mail at 2.)

Meanwhile, on September 27 or 28, 2011—after Jewell's first call to Liberty reiterating the Union's refusal to adopt a defined contribution plan but before Jewell's second call purportedly reversing positions and asking to restart negotiations—Liberty had called AMO and had solicited that union to enter into a labor agreement that would replace Liberty's expiring agreement with MEBA; Liberty and AMO in fact reached an oral agreement that was scheduled to take effect at 12:01 a.m. on October 1, 2011. (*See* Keenan Dep. 180:5-182:7 (describing Keenan's call with AMO representative Daniel Shea); Dep. of Philip Shapiro ("Shapiro Dep."), ECF No. 27-5, at 107:1-8 (acknowledging that Liberty contacted AMO, and that the rival union agreed to provide employees to Liberty once the Company's agreement with MEBA expired).) In accordance with Liberty's position on the labor contract negotiations, MEBA-represented employees worked under the prior agreement until midnight on September 30, 2011, at which point, on October 1, 2011, AMO-represented personnel came aboard instead. (*See* Van Loo Dep. at 26:9-11 (testifying that MEBA officers left Liberty ships at midnight on September 30th); Keenan Decl. ¶¶ 6-9 (stating that AMO began placing licensed supervisory personnel on Liberty bulk carrier vessels on October 1, 2011).) Liberty and AMO signed a formal CBA on October 3, 2011, with retroactive effect to October 1, 2011. (AMO-Liberty CBA, ECF No. 27-26, at 4; *see also* Shapiro Dep. at 143:16-144:19 (discussing the Liberty-AMO agreement).)[4]

---

[4] MEBA continues to represent officers on Liberty's "PCTC" or "pure car truck carriers[.]" (*See, e.g.*, Keenan Dep. at 25:5-6.) None of the issues in the instant case pertain to those officers.

### C.     Procedural History

#### 1.     MEBA's Formal Grievances And Liberty's Subsequent Denials

On September 30, 2011, MEBA filed a formal grievance with Liberty "in accordance with the express terms and conditions of the CBA including" the MOU. (Grievance Letter from Van Loo to Shapiro (Sept. 30, 2011) ("Sept. 30th Grievance Letter"), ECF No. 26-2 at 37-38, 37.)  MEBA alleged that the Company had breached the parties' agreement "by failing and refusing to recognize the MEBA as the sole representative of its licensed engineers and deck officers[.]"  (*Id.*)  Specifically, the Union claimed that Liberty had breached the CBA because it "entered into another Agreement with [AMO] to provide licensed officers for the manning of Liberty's bulk carriers."  (*Id.*)

On October 7, 2011, MEBA sent Liberty a letter amending its grievance, alleging that Liberty's conduct also violated the duration provision of the parties' MOU "by failing and refusing to maintain in effect the terms and conditions of the agreement until mutual agreement on the proposed amendments or an impasse has been reached." (Grievance Letter from Jewell to Miossi (Oct. 7, 2011) ("Oct. 7th Grievance Letter"), ECF No. 26-2 at 39-40, 39.)  The October 7th letter also alleged that Liberty violated the CBA "by authorizing and participating in a lockout of its [MEBA-represented] employees[,]" and that the Company's actions, taken together, "breached the good faith and fair dealing requirements inherent in the CBA."  (*Id.*)[5]

---

[5] Liberty construes these additional allegations as a separate grievance.  (*See* Def.'s Br. at 24, ¶ 52.) Because the determination of whether a grievance is actionable depends on whether the CBA is still in effect at the time of the conduct giving rise to the claim, and not when the grievance itself is filed, *see Int'l Bhd. Of Elec. Workers, Local 1200 v. Detroit Free Press, Inc.*, 748 F.3d 355, 357-358 (D.C. Cir. 2014) (citations omitted), this is a distinction without a difference.

Liberty responded to the grievance letters by issuing written denial letters, contending that "the CBA expired according to its terms" on September 30, 2011 (Letter from Miossi to Van Loo (Oct. 7, 2011), ECF No. 26-2 at 43-44, 43), and that the parties reached impasse "at the latest on September 27, 2011, when [Jewell] advised Liberty" that MEBA refused to agree to the pension plan change (Letter from Miossi to Jewell (Oct. 18, 2011) ("Oct. 18th Denial Letter"), ECF No. 26-2 at 45-46, 45). (*See also* Jewell Decl. ¶¶ 16-17 (describing grievance letters and denials).) Following Liberty's denials, MEBA "request[ed] that the parties convene a License[d] Personnel Board . . . pursuant to" the arbitration provision in the CBA in order to resolve MEBA's grievances (Letter from Jewell to Miossi (Oct. 21, 2011), ECF No. 26-2 at 41), but Liberty refused to do so (Jewell Decl. ¶ 19).

### 2. The Instant Action And Liberty's Unfair Labor Practice Charge With The NLRB

MEBA filed the instant action on October 11, 2011, seeking a declaratory judgment that the parties have not reached impasse in their collective bargaining negotiations and an order from this Court compelling arbitration of the Union's grievances. (*See* Compl. ¶¶ 1-3, 29-30, 32-33, 37.) On March 30, 2012, Liberty filed an unfair labor practice charge with the NLRB pursuant to section 8 of the NLRA, specifically arguing that "[t]he relief [MEBA] seeks through its lawsuit"—namely, according to Liberty, "to reinstate and/or renew the expired collective bargaining agreement and coerce the [Company] to replace the current supervisory personnel"— "violates section 8(b)(1)(B) of the" NLRA. (Def.'s NLRB Unfair Labor Practice Charge (Mar. 30, 2012) ("Def.'s NLRB Charge"), ECF No. 26-2 at 50-53, 52; *see also* Jewell Decl. ¶ 20 (describing charge).) Liberty also claimed that "the Board has

exclusive jurisdiction over the issues raised by" MEBA's lawsuit. (Def.'s NLRB Charge at 52.)

On September 12, 2012, the NLRB's Office of the General Counsel issued an advisory letter disagreeing with Liberty and recommending that Liberty's unfair labor practice charge "be dismissed, absent withdrawal." (Advice Mem., NLRB Office of the General Counsel (Aug. 31, 2012) ("OGC Advice Mem."), ECF No. 26-2 at 57-62, 57.) The NLRB's General Counsel concluded that MEBA's instant suit against Liberty "has a reasonable basis" and "[f]urther, [that] the Union's demand for arbitration and the filing of a federal lawsuit does not have an unlawful object because it does not seek a result incompatible with Board law." (*Id.* at 57, 62.) To the contrary, the General Counsel found that the lawsuit "seeks to resolve a bona fide contractual issue by simply holding the Company accountable to its contractual obligations." (*Id.* at 62.) Apparently, in light of the advisory letter, Liberty chose to withdraw its charge rather than face dismissal, and on September 12, 2012, the NLRB notified MEBA that it had "approved withdrawal of [Liberty's] charge" against the Union. (Letter from Wayne R. Gold, Reg'l Dir. of NLRB Region 5, to Jewell (Sept. 12, 2012) ("Gold Letter"), ECF No. 26-2, at 55.)

### 3.   Dispositive Motions And Discovery In The Instant Action

Meanwhile, in federal court, MEBA's case (the instant action) proceeded through litigation.[6] In November of 2011, MEBA moved for summary judgment (*see* Pl.'s Mot. for Summ. J., ECF No. 7), while Liberty moved to dismiss the complaint for lack of jurisdiction on the grounds that this case raises claims that the NLRB, not a federal

---

[6] This case was previously before District Judge Emmet G. Sullivan. It was transferred to the undersigned on April 5, 2013. (*See* Minute Entry, Apr. 30, 2013 (reassigning case).)

court, must address (*see* Def.'s Mot. to Dismiss, ECF No. 4). The Court required supplemental briefing on the question of whether it needed to determine if the parties had reached an impasse in their bargaining negotiations in order to answer the jurisdictional question, and later found that there were genuine issues of fact regarding whether the parties had reached impasse within the meaning of the CBA, and thus whether the CBA was still in place at the time of the alleged violations. (*See* Minute Order, Aug. 30, 2012; *see also* Teleconf. Tr., July 26, 2012 ("Teleconf. Tr."), ECF No. 29-1, at 7.) Consequently, the Court denied both parties' dispositive motions without prejudice to refiling after discovery. (*See* Minute Order, Aug. 30, 2012.) The parties proceeded to complete a year-long period of discovery, and then filed the cross-motions for summary judgment that are presently before this Court.[7]

## II. LEGAL STANDARDS

Both parties style their pending dispositive motions as motions for summary judgment; however, because Liberty's chief argument is that this Court lacks subject matter jurisdiction over the instant case, the Court treats Liberty's jurisdiction argument as it would a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1). *See, e.g.*, *Friends of the Earth v. EPA*, 934 F. Supp. 2d 40, 44-45 (D.D.C. 2013) (treating defendant's motion for summary judgment as a motion to dismiss under Rule 12(b)(1) because "the threshold issue" before the court was subject matter jurisdiction). Consequently, the governing standards for both motions to dismiss and motions for summary judgment are pertinent to the matter at hand.

---

[7] This Court has reviewed the parties' summary judgment motions, their oppositions to each other's summary judgment motions, as well as separate replies that each party filed. (*See* Pl.'s Mot. for Summ. J. ("Pl.'s Mot."), ECF No. 26; Def.'s Mot. for Summ J. ("Def.'s Mot."), ECF No. 27; Pl.'s Resp. to Def.'s Mot., ECF No. 29; Def.'s Mem. in Opp'n to Pl.'s Mot., ECF No. 30; Pl.'s Reply in Supp. of Pl.'s Mot., ECF No. 31; Def.'s Reply in Supp. of Def.'s Mot., ECF No. 32.)

## A. Legal Standard For A Motion To Dismiss For Lack Of Subject Matter Jurisdiction Under Rule 12(b)(1)

Under Rule 12(b)(1), the plaintiff bears the burden of establishing the existence of jurisdiction by a preponderance of the evidence. *Erby v. United States*, 424 F. Supp. 2d 180, 182 (D.D.C. 2006) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)); *see also Grand Lodge of Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d. 9, 13 (D.D.C. 2001) (noting that a court has an "affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority"). Where, as here, a defendant makes a facial challenge to subject matter jurisdiction, "a court must accept as true all factual allegations contained in the complaint, and the plaintiff should receive the benefit of all favorable inferences that can be drawn from the alleged facts." *Sickle v. Torres Advanced Enter. Solutions, LLC*, No. 11-2224, 2013 WL 7231238, at *3 (D.D.C. Dec. 24, 2013) (citing *Flores v. Dist. of Columbia*, 437 F. Supp. 2d 22, 28 (D.D.C. 2006)). It is well established that a district court considering a facial challenge to subject matter jurisdiction may also consider "materials outside the pleadings as it deems appropriate[,]" *Friends of the Earth*, 934 F. Supp. 2d at 45 (internal quotation marks and citation omitted), so long as the court "still accept[s] all of the factual allegations in the complaint as true," *Jerome Stevens Pharm., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005) (internal quotation marks and citation omitted).

## B. Legal Standard For A Motion For Summary Judgment Under Rule 56

Federal Rule of Civil Procedure 56 makes clear that summary judgment is appropriate only if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court's role in deciding a summary judgment motion is not to "determine the truth of the matter, but

instead [to] decide only whether there is a genuine issue for trial." *Barnett v. PA Consulting Grp., Inc.*, 715 F.3d 354, 358 (D.C. Cir. 2013) (internal quotation marks and citation omitted). "A fact is material if it 'might affect the outcome of the suit under the governing law,' and a dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party.'" *Steele v. Schafer*, 535 F.3d 689, 692 (D.C. Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

In determining whether there is a genuine dispute about material facts, the Court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *See, e.g.*, *Grosdidier v. Broad. Bd. of Governors, Chairman*, 709 F.3d 19, 23-24 (D.C. Cir. 2013); *see also Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007). The moving party may successfully support its motion by identifying those portions of the record that it believes demonstrate the absence of a genuine dispute of material fact. Fed. R. Civ. P. 56(c)(1)(A). The non-moving party, for its part, must show more than "[t]he mere existence of a scintilla of evidence in support of" his position; rather, "there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252. Further, the non-moving party "may not rest upon mere allegations or denials of his pleading but must present affirmative evidence showing a genuine issue for trial." *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987) (internal quotation marks omitted).

"The rule governing cross-motions for summary judgment . . . is that neither party waives the right to a full trial on the merits by filing its own motion; each side

concedes that no material facts are at issue only for the purposes of its own motion." *Sherwood v. Wash. Post*, 871 F.2d 1144, 1188 n.4 (D.C. Cir. 1989) (alteration in original) (internal quotation marks and citation omitted). "In assessing each party's motion, all underlying facts and inferences are analyzed in the light most favorable to the non-moving party." *Vaughan v. Amtrak*, 892 F. Supp. 2d 84, 91-92 (D.D.C. 2012) (internal quotation marks and citation omitted)).

## III.    ANALYSIS

Before turning to the question of whether the parties must arbitrate MEBA's grievances, this Court must first decide whether the NLRB has exclusive jurisdiction pursuant to the Supreme Court's decision in *San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 244 (1959), or whether this Court has subject matter jurisdiction over Plaintiff's claims under section 301. As explained below, this Court finds that Plaintiff's claims are primarily contractual and not, as Defendant contends, purely representational, and thus concludes that this Court may properly exercise jurisdiction under section 301. As to whether the parties must arbitrate the Union's grievances, it is undisputed that the parties entered into a valid, binding contract in the first instance, and that contract includes a broad arbitration provision. (*See* CBA, ECF No. 26-2, at 30.) The only question is whether that agreement was still in effect at the time of the alleged violations, and that question turns on whether and when the parties reached "impasse" in their negotiations. Because this Court concludes that whether the parties' agreement expired is itself an issue of contract interpretation that the parties agreed to arbitrate, the Court finds that the question of impasse is one for an arbitrator to decide.

### A.     This Court Has Subject Matter Jurisdiction Over Plaintiff's Claims Pursuant to Section 301

As noted above, section 301 empowers federal district courts to hear "[s]uits for violation of contracts between an employer and a labor organization[.]"  29 U.S.C. § 185(a).  Liberty contends, however, that notwithstanding MEBA's purported reliance on section 301, the claims before this Court at present are actually representational section 8 claims.  (*See* Def.'s Br. at 29-33.)  Put another way, while MEBA's complaint ostensibly seeks relief under section 301 for an alleged breach of the parties' collective bargaining agreement, Liberty characterizes the dispute as a purely representational matter outside the jurisdiction of the federal courts.  (*See id.*)  Specifically, Liberty contends that MEBA's ultimate objective is to replace Liberty's AMO-represented supervisors with MEBA-represented supervisors in violation of Liberty's "representational rights under Section 8(b)(1)(B)" (*id.* at 32), and that MEBA's claims therefore fall within the NLRB's exclusive purview under the Supreme Court's decision in *Garmon* (*id.* at 32-33), which Liberty cites for the proposition that "[w]hen an activity is arguably subject to § 7 or § 8 of the Act, the States as well as the federal courts must defer to the exclusive competence of the [NLRB]" (*id.* at 28 (alteration in original) (citing *Garmon*, 359 U.S. at 245)).

In the years following its decision in *Garmon*, however, the Supreme Court has explained that "[w]hen an activity is . . . arguably prohibited by § 8" and "the activity in question also constitutes a breach of a collective bargaining agreement, the Board's authority 'is not exclusive and does not destroy the jurisdiction of the courts in suits under § 301.'"  *William E. Arnold Co. v. Carpenters Dist. Council of Jacksonville & Vicinity*, 417 U.S. 12, 15-16 (1974) (quoting *Smith v. Evening News Ass'n*, 371 U.S.

195, 197 (1962)); *see also Amalgamated Ass'n of St., Elec. Ry. & Motor Coach Emps. v. Lockridge*, 403 U.S. 274, 298 (1971) ("[S]uits brought to enforce collective-bargaining agreements . . . are judicially cognizable, even where the conduct alleged was arguably protected or prohibited by the [NLRA]."). Rather, "'[t]he strong policy favoring judicial enforcement of collective-bargaining contracts [is] sufficiently powerful to sustain the jurisdiction of the district courts over enforcement suits even though the conduct involved was . . . within the jurisdiction of the [NLRB].'" *Jackson v. Teamsters Local Union 922*, 991 F. Supp. 2d 71, 81 (D.D.C. 2014) (alterations in original) (quoting *Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 562 (1976)).

Reading *Garmon* and the above precedent together, most courts take the approach that if a dispute "is a matter primarily of contract interpretation, while potentially implicating [section 8] representational issues" then "a federal court may properly exercise its [section 301] jurisdiction over the matter." *Paper, Allied-Indus., Chem. & Energy Workers Int'l Union v. Air Prods. & Chems., Inc.*, 300 F.3d 667, 672 (6th Cir. 2002). In other words, "federal courts may have concurrent jurisdiction" with the NLRB "where a party's conduct leads to charges of both unfair labor practices under the NLRA and breach of a CBA under § 301(a) of the LMRA." *DiPonio Constr. Co. v. Int'l Union of Bricklayers & Allied Craftworkers, Local 9*, 687 F.3d 744, 749 (6th Cir. 2012); *see also Hotel & Rest. Emps. Union Local 217 v. J.P. Morgan Hotel*, 996 F.2d 561, 565 (2d Cir. 1993) (holding that section 301 "grants courts concurrent jurisdiction [with the NLRB] over representation issues arising under a contract"). On the other hand, if a dispute is "primarily representational" then "simply referring to the claim as a 'breach of contract' [is] insufficient for purposes of § 301 federal courts'

jurisdiction"—*i.e.*, parties may not circumvent *Garmon* merely by styling representational issues as contract disputes. *Paper, Allied-Indus., Chem. & Energy Workers Int'l Union*, 300 F.3d at 675; *see also Int'l Bhd. of Elec. Workers, Local 71 v. Trafftech, Inc.*, 461 F.3d 690, 695 (6th Cir. 2006) (distinguishing between primarily representational and primarily contractual claims for purposes of section 301 jurisdiction); *Pace v. Honolulu Disposal Serv., Inc.*, 227 F.3d 1150, 1157 (9th Cir. 2000) (drawing a "jurisdictional line" between "primarily representational" and "primarily contractual" disputes (internal quotation marks and citation omitted)); *Kansas City S. Transp. Co. v. Teamsters Local Union No. 41*, 126 F.3d 1059, 1064 (8th Cir. 1997) (determining the court's section 301 jurisdiction "by examining whether the major issues to be decided can be characterized as primarily representational or primarily contractual" (internal quotation marks and citation omitted)); *United Food & Commercial Workers Union, Local 400 v. Shoppers Food Warehouse Corp.*, 35 F.3d 958, 961 (4th Cir. 1994) ("[C]ourts generally have allowed arbitration to proceed unless a dispute is so 'primarily representational,' that it falls solely within the Board's jurisdiction."); *Trustees of Colo. Statewide Iron Workers Trust Fund v. A & P Steel, Inc.*, 812 F.2d 1518, 1526 (10th Cir. 1987) ("We find that the representational issue before us attaches to a genuine section 301 contract dispute as a collateral issue and that the case is not so primarily representational as to preclude section 301 jurisdiction." (internal quotation marks and citation omitted)).

Courts generally recognize only "two types of situations in which a dispute will be treated as primarily representational[.]" *Trafftech*, 461 F.3d at 695. First, situations "where the Board has already exercised jurisdiction over a matter and is either

considering it or has already decided the matter[.]" *Id.* (citing *Local Union 204 of the Int'l Bhd. of Elec. Workers v. Iowa Elec. Light & Power Co.*, 668 F.2d 413, 420 (8th Cir. 1982)). And second, situations "where the issue is an 'initial decision [] in the representation area.'" *Id.* (alteration in original) (quoting *J.P. Morgan Hotel*, 996 F.2d at 565). The latter are situations were a court—and not the NLRB—is asked to determine whether a person or group of persons is a proper collective bargaining representative in the first instance. *See, e.g., Amalgamated Clothing & Textile Workers Union v. Facetglas, Inc.*, 845 F.2d 1250, 1253 (4th Cir. 1988) (district court could not exercise section 301 jurisdiction where "the court could not possibly determine whether there has been a violation of the [CBA] without first deciding whether the union was elected as the employees' bargaining representative" (internal quotation marks and citation omitted)); *see also S. Prairie Constr. Co. v. Local No. 627, Int'l Union of Operating Eng'rs*, 425 U.S. 800, 803-806 (1976) (per curiam) (initial determination of whether employees constituted single bargaining unit was for the NLRB, not the courts, to decide).

Neither situation arises here. Although Liberty previously filed an unfair labor practices charge with the NLRB, the NLRB's General Counsel "conclude[d] that the charge should be dismissed, absent withdrawal." (OGC Advice Mem. at 57.) Liberty subsequently withdrew its charge (*see* Gold Letter at 55), and, at present, no aspects of this matter are before the Board. Moreover, the Board's General Counsel expressly noted in his advisory memorandum that the requested relief in the instant matter— which could ultimately result in "substituting one group of [supervisors] with another"—"would not constitute an 'unlawful object'" under Board precedent (*id.* at

59), and that "the Union's demand for arbitration and the filing of a federal lawsuit . . . seeks to resolve a bona fide contractual issue" (*id.* at 62).

As to the second type of situation that might suggest a party's claim is primarily representational, it is undisputed in the instant case that the parties entered into a valid CBA in which Liberty recognized MEBA "as the sole representative" of its "licensed engineers on its U.S. flag ocean going tankers" (CBA, ECF No. 27-2, at 7), all of whom the parties agreed are supervisors (*id.* at 6). There is, therefore, neither need nor occasion for this Court to make initial representation determinations in the instant case. Accordingly, this Court finds that Plaintiff's claims are *not* purely, or even primarily, representational. Rather, accepting all of the factual allegations in Plaintiff's complaint as true and taking into consideration the record documents both parties have provided, this Court concludes that MEBA's claims are first and foremost contractual, and, consequently, that the strong policy in favor of judicial enforcement of collective bargaining agreements sustains federal court jurisdiction in the instant case. *See Jackson*, 991 F. Supp. 2d at 81.

Defendant's arguments to the contrary are unconvincing. Liberty repeatedly asserts that the Union's ultimate objective—returning MEBA-represented supervisors to employment aboard Liberty's vessels—raises section 8 representation issues (*see* Def.'s Br. at 28-33; Def.'s Reply in Supp. of Def.'s Mot. ("Def.'s Reply"), ECF No. 32, at 6-7), but the Supreme Court has made it clear beyond cavil that the fact that a contractual claim may have an unfair labor practice aspect does not necessarily preclude federal courts' section 301 jurisdiction. *See, e.g.*, *William E. Arnold Co.*, 417 U.S. at 15-16; *Lockridge*, 403 U.S. at 298; *Hines*, 424 U.S. at 562. Moreover, the NLRB's Office of

General Counsel explicitly rejected Liberty's assertions that the relief requested in the instant suit violates section 8(b)(1)(B).  (*See* OGC Advice Mem. at 59 (noting that requested relief "would not constitute an 'unlawful object'" under NLRB precedent).)[8]

Liberty's reliance on *Morello v. Federal Barge Lines, Inc.*, 746 F.2d 1347 (8th Cir. 1984), is misplaced.  (*See* Def.'s Br. at 33-34.)  In *Morello*, a union that represented supervisory marine officers, Local No. 54, was party to CBAs with two shipping companies, and the CBAs in that case contained duration provisions similar to the one at issue here—they provided that the CBAs would remain in effect unless the parties served written notice at least 60 days before the respective expiration dates.  *Id.* at 1348.  In *Morello*, both companies filed timely termination notices.  *Id.*  In response, the union served notices to open negotiations, which the companies disregarded.  *Id.* Apparently, the companies "believed there was no obligation under federal law to negotiate" with a union representing solely statutorily exempt supervisors, and the parties' agreements stipulated that "all [d]eck officers covered by this agreement are supervisors within the definition of supervisors as set forth in the [NLRA]."  *Id.* (internal quotation marks and footnote omitted).  The union eventually filed suit in district court under section 301, specifically alleging that the companies breached their respective CBAs "by refusing to negotiate over the supervisory status of their [union] member employees" and seeking an injunction compelling arbitration.  *Id.* at 1348-1349.  When the companies moved to dismiss for lack of subject matter jurisdiction, the

---

[8] The Office of General Counsel also noted that "the bargaining unit [in the instant matter] is composed of Section 2(11) supervisors, and thus the contract is enforceable only by a lawsuit."  (OGC Advice Mem. at 61).  *See also*, *supra* n.2 (explaining that supervisors are ordinarily excluded from the NLRA's protections).  And though "such a lawsuit would violate Section 8(b)(1)(B) in the absence of a continuing bargaining obligation," the Board's General Counsel opined, "the Union's lawsuit asserts that such a continuing bargaining obligation exists and the evidence demonstrates that the lawsuit has a reasonable basis."  (OGC Advice Mem. at 61-62.)

district court denied the motion, concluding that the court had jurisdiction "because [the union] was not seeking a determination on the supervisory status of its members but rather was alleging a breach of contract under section 301[.]" *Id.* at 1349. The Eighth Circuit disagreed, holding that (1) "the center of the 'dispute' in this case is the question of whether [the union's] members are employees or supervisors within the meaning of the [NLRA]" *id.*; (2) that "question is one of representation" *id.*; and (3) such a question "can be determined only by the NLRB" *id.* at 1350.

The same cannot be said of the instant case. Defendant's attempt to equate MEBA's claims to the plaintiff-union's claims in *Morello* ignores the crucial distinction that, unlike the plaintiff-union in *Morello*, MEBA here does not seek to arbitrate the issue of whether its members are statutorily classified as supervisors. (*See* Sept. 30th Grievance Letter at 37-38; Oct. 7th Grievance Letter at 43-44.)[9] Rather, the Union's grievance letters allege that the parties' CBA was still in effect when Liberty entered into a labor contract with another union and other particular violations of the parties' CBA. (*See* Sept. 30th Grievance Letter at 37-38; Oct. 7th Grievance Letter at 43-44.) Thus, this Court disagrees with Defendant's characterization of MEBA's case as presenting "precisely" the same dispute as *Morello*. (Def.'s Br. at 34.)

In the end, despite Defendant's attempts to frame "the central question in this case" as "which union will represent Liberty Maritime's supervisors" (Def.'s Reply at 1), Liberty cannot escape the fact that, although MEBA's grievances may eventually implicate representational issues, the representational matter is a collateral consequence

---

[9] Indeed, MEBA does not appear to dispute that the MEBA members Liberty employed are supervisors. (*See* Jewell Dep. at 20:20-21:9 (testifying that the MEBA-represented "deck officers and engineers" who worked aboard Liberty bulk carriers are "supervisors as that term is defined by the National Labor Relations Act").)

of claims grounded in breach of particular sections of the parties' CBA.  Thus, although the Union's section 301 claims may have a representational edge, they are of the type that gives this Court and the NLRB concurrent jurisdiction.

**B.    The Issue Of Whether The Parties' Agreement Expired Is A Question Of Contract Interpretation That The Parties Agreed To Arbitrate**

Having satisfied itself of jurisdiction, this Court turns to the merits of the parties' summary judgment arguments.  Defendant urges this Court to find that because the parties reached "impasse" in their negotiations, their otherwise valid prior agreement—including the arbitration clause—"expired at midnight on September 30, 2011[,]" pursuant to the agreement's duration provision.  (Def.'s Br. at 37.) Consequently, Defendant argues, this Court may not compel arbitration as a matter of law, and summary judgment must be entered in its favor.  (*See id.* at 37-38.)  This Court concludes, however, that pursuant to the broad language of the parties' arbitration clause, whether or not the contract expired is a question for an arbitrator to decide.

It is well established that "'arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'" *AT&T Techs., Inc. v. Commc'ns Workers*, 475 U.S. 643, 648 (1986) (quoting *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960)).  In other words, courts may only compel parties to arbitrate disputes that fall within the scope of their agreed-upon arbitration clause.  At the same time, however, the presence of an arbitration clause gives rise to a strong "presumption of arbitrability" in federal labor law cases.  *Wash. Mailers Union No. 29 v. Wash. Post Co.*, 233 F.3d 587, 589 (D.C. Cir. 2000).  This means that a motion to compel arbitration of a "particular grievance should not be denied unless it may be said with positive assurance that the arbitration

clause is not susceptible of an interpretation that covers the asserted dispute." *Warrior & Gulf*, 363 U.S. at 582-583; *see also AT&T Techs., Inc.*, 475 U.S. at 650 (quoting *id.*). Any "[d]oubts should be resolved in favor of coverage." *Warrior & Gulf*, 363 U.S. at 583. Furthermore, "[u]nless the parties clearly and unmistakably provide otherwise," questions of arbitrability—*i.e.*, whether parties agreed to submit a particular dispute to arbitration—are ordinarily decided "by the court, not the arbitrator." *AT&T Techs., Inc.*, 475 U.S. at 649 (citing *Warrior & Gulf*, 363 U.S. at 582-583); *see also Sheet Metal Workers' Int'l Ass'n v. United Transp. Union*, 767 F. Supp. 2d 161, 169 (D.D.C. 2011) ("Because arbitration provisions are in essence a matter of contract between the parties, courts decide whether the parties are bound by a given arbitration clause." (citing *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002)).[10]

Significantly, there are different kinds of disputes that arise in arbitrability cases, including disputes over the "formation of an agreement to arbitrate[,]" over the "breadth of an arbitration clause," or, as in the instant case, over the duration of an arbitration clause. *Nat'l R.R. Passenger Corp. v. Bos. & Me. Corp.*, 850 F.2d 756, 761 (D.C. Cir. 1988); *see also id.* at 761-762 (discussing a "trichotomy among the disputes that arise in arbitrability cases"). In *National Railroad Passenger Corp. v. Boston & Maine Corp.*, the D.C. Circuit articulated the proper framework for deciding arbitrability disputes that center on "the expiration or termination of an arbitration clause[,]" such as the parties' dispute in this matter. 850 F.2d at 762. To determine whether parties

---

[10] The D.C. Circuit has explained that there is an important distinction between the doctrine favoring arbitration in labor disputes and "the modern doctrine favoring commercial arbitration"—namely, the former "derived from § 301 and national labor policy" while the latter "stemmed from the Federal Arbitration Act, 9 U.S.C. §§ 1-14." *Finegold, Alexander & Assocs., Inc. v. Setty & Assocs., Ltd.*, 81 F.3d 206, 208 (D.C. Cir. 1996). As the *Finegold* court noted, this distinction has "beg[u]n to fade from memory" and "[t]here may no longer be much of a distinction between the two lines of cases," but "precision" nonetheless counsels against "treating them interchangeably." *Id.* (citations omitted).

intended to arbitrate this particular type of dispute, courts must first look to the text of the arbitration clause at issue. *See id.* at 762; *see also Camping Constr. Co. v. Dist. Council of Iron Workers*, 915 F.2d 1333, 1340 (9th Cir. 1990) ("[Q]uestions of whether [a] contract has expired, or has been terminated or repudiated, may well present arbitrable issues, depending on the language of the agreed-upon arbitration clause."). "If the arbitration clause is a narrow one, covering only specified types of disputes (such as employee grievances), then [courts] must presume that the parties did not intend for disputes over contract duration to be referred to arbitration." *Nat'l R.R. Passenger Corp.*, 850 F.2d at 762. If, however, the parties' agreed to a "somewhat broader arbitration clause," then courts "will presume that disputes over the termination or expiration of the contract should be submitted to arbitration." *Id.* Examples of arbitration clauses that are broad enough to raise this specific presumption of arbitrability include, but are not limited to, clauses "providing generally . . . that disputes 'arising under' or 'concerning' the contract are to be arbitrated," *id.*, and clauses "requiring arbitration of 'any grievance affecting the mutual relations of the parties'" *id.* (quoting *Bhd. of Teamsters & Auto Truck Drivers Local No. 70 v. Interstate Distributor Co.*, 832 F.2d 507, 510 n.2 (9th Cir. 1987)).

The arbitration clause in the instant case clearly states that "[a]ll disputes relating to the interpretation or performance of this Agreement shall be determined in accordance with the [grievance and arbitration] provisions" contained therein. (CBA, ECF No. 26-2, at 30.) While this language could arguably be read to limit arbitration to issues of contract "interpretation or performance[,]" courts generally interpret such language as an indicia of breadth rather than narrowness. For example, in *Unite Here*

*Local 217 v. Sage Hospitality Resources*, 642 F.3d 255 (1st Cir. 2011), the First Circuit characterized an arbitration clause as "broad" precisely because it contained language similar to the clause in the instant case, *id.* at 262—the clause in that case provided that "any dispute over the interpretation or application" of the agreement would be subject to arbitration, *id.* at 257; *see also Util. Workers Union, Local 118 v. Ohio Edison Co.*, No. 97-4332, 1998 WL 869941, at *3 (6th Cir. Dec. 3, 1998) (per curiam) (arbitration clause "provid[ing] for arbitration over 'any disagreement concerning the interpretation or application of this Agreement'" was "a broad [clause] which . . . triggers the presumption in favor of arbitration").  Moreover, the arbitration clause in the instant case elsewhere employs language similar to the language that the *National Railroad Passenger Corp.* court explicitly identified as broad, stating that the parties agree to submit "any grievances that each party may have" to arbitration.  (CBA, ECF No. 26-2, at 31.)  Accordingly, this Court finds that the parties' arbitration clause is of the "somewhat broader" type that gives rise to a presumption of arbitrability for disputes over contract duration.  *Nat'l R.R. Passenger Corp.*, 850 F.2d at 762.

Even if this Court were to read the instant arbitration clause to suggest that the parties only intended to arbitrate issues of contract interpretation and performance, the question of whether the parties' otherwise valid agreement expired *is* precisely such an issue—it requires interpretation of the agreement's duration provision, which provides in relevant part that:  "In the event either the Company or the Union serves notice to amend the Agreement, the terms of the Agreement in effect at th[e] time of the notice to amend shall continue in effect until mutual agreement on the proposed amendments or an impasse has been reached."  (MOU, ECF No. 26-2, at 11.)  *See also Unite Here*

*Local 217*, 642 F.3d at 262 (disputes over "the meaning of language in [a] duration clause" are "classic issue[s] of contract construction"). On its face, then, the arbitration clause—which commits to arbitration "[a]ll disputes relating to the interpretation or performance" of the agreement—is at least broad enough to encompass disputes over how to interpret the above quoted duration clause. Indeed, in *AT&T Technologies, Inc. v. Communications Workers of America*, the Supreme Court deemed a similar arbitration clause "broad" because it "provide[d] for arbitration of 'any differences arising with respect to the interpretation of this contract or the performance of any obligation hereunder[.]'" 475 U.S. at 650. The Supreme Court further noted that the general "presumption of arbitrability . . . is particularly applicable where the clause is as broad as the one employed in this case[.]" *Id.* Accordingly, because the parties in the instant case agreed to a broad arbitration clause that encompasses issues of contract interpretation, this Court "will presume that [the parties intended] disputes over the termination or expiration of the contract should be submitted to arbitration." *Nat'l R.R. Passenger Corp.*, 850 F.2d at 762.

Be that as it may, once it has arisen, "the presumption in favor of arbitrating disputes over contract duration can be overcome by a clear showing that the parties intended for the underlying contract to expire, or separately agreed to terminate it, before the relevant dispute arose." *Id.* at 763. In the instant case, Liberty may overcome the presumption "either (1) by demonstrating that the original contract contains an unambiguous expiration date; or (2) by making a clear showing that the contract was properly terminated before this dispute arose." *Id.* This Court concludes that Defendant fails to make either showing. As to the first, the duration provision does

state that the parties' agreement shall "continue in full force and effect until midnight, September 30, 2011," but the text goes on to provide that the agreement "shall continue from year to year thereafter unless either the Company or the Union shall give written notice to the other of its desire to amend the Agreement, which shall be given at least sixty (60) days, but no sooner than ninety (90) days, prior to the expiration date." (MOU, ECF No. 26-2, at 11.)  Furthermore, the duration provision continues:  if "either the Company or the Union serves notice to amend the Agreement," then "the terms of the Agreement in effect at th[e] time of the notice to amend shall continue in effect until mutual agreement on the proposed amendments or an impasse has been reached." (*Id.*)  This textual indefiniteness regarding the duration of the agreement is precisely why the heart of the dispute in the instant case is whether the parties reached "impasse" in their negotiations over proposed changes to the underlying CBA.  If the parties did reach impasse, then the agreement presumably expired on the prescribed date of midnight on September 30, 2011.  However, if the parties did not reach impasse, then, arguably, "the terms of the Agreement . . . continue[d] in effect" and, pursuant to those terms, the agreement may have automatically "continue[d] from year to year" beyond midnight on September 30, 2011, and the agreement was conceivably breached when Liberty entered into an oral contract with AMO.  In light of this central dispute, Defendant has not shown that "the original contract contains an unambiguous expiration date[.]"  *Nat'l R.R. Passenger Corp.*, 850 at 763.

Nor has Defendant made "a clear showing that the contract was properly terminated before" MEBA's grievances arose.  *Id.*  There is no question that the contract was in place in August of 2011, when Liberty met with AMO in secret while

33

still negotiating with MEBA—conduct that, in part, gave rise to the grievances MEBA now seeks to arbitrate. (*See* Sept. 30th Grievance Letter at 37 (alleging that Liberty "breached the CBA by failing and refusing to recognize the MEBA as the sole representative of its licensed engineers and deck officers").)  There also does not appear to be a genuine dispute that the contract was in effect on September 27, 2011, and September 28, 2011, when Liberty reached an oral agreement with AMO to enter into a new labor agreement (*see* Keenan Dep. at 180:5-182:7 (describing Keenan's call with AMO); Shapiro Dep. at 107:1-8 (acknowledging contact and agreement with AMO)).  It also seems entirely plausible on the record facts here that the parties' contract was in effect during the day on September 30, 2011, when MEBA filed its initial grievance specifically alleging that Liberty's "ent[ry] into another Agreement with another labor organization to provide licensed officers for the manning of Liberty's bulk carriers" constituted a breach of the CBA.  (Sept. 30th Grievance Letter at 37.)  Despite Liberty's claim that the parties had reached impasse sometime before "midnight on September 30, 2011" (*see* Def.'s Br. at 37 ), it is undisputed that the Company continued to employ MEBA-represented licensed engineers aboard its ships pursuant to the contract until at least midnight on September 30th.[11]  Consequently, it is far from clear that the parties' contract terminated before MEBA's grievances arose, and Defendant fails to rebut the presumption that the parties' dispute regarding contract duration should be referred to arbitration.

Defendant provides little support for its argument that this Court, and not an arbitrator, must decide whether the parties' agreement expired.  While Liberty chiefly

---

[11] Notably, Liberty appears to have retrenched from its earlier position that "an impasse was reached at the latest on September 27, 2011[.]"  (Oct. 18th Denial Letter at 45.)

relies on a 2012 district court opinion from this jurisdiction, the arbitrability dispute in that case focused on contract *formation*. (*See* Def.'s Opp'n to Pl.'s Mot., ECF No. 30, at 19-20 (quoting *Unite Here Local 25 v. Madison Ownership, LLC*, 850 F. Supp. 2d 219, 228 (D.D.C. 2012).) *See also Unite Here Local 25*, 850 F. Supp. 2d at 228 ("It is well settled that where the dispute at issue concerns contract formation, the dispute is generally for courts to decide." (internal quotation marks and citation omitted)). And, as the D.C. Circuit has made clear, disputes over contract formation are substantively different from disputes over the duration of a validly formed contract. *See Nat'l R.R. Passenger Corp.*, 850 F.2d at 761-762 (distinguishing types of arbitrability disputes). This is because "[w]hen there is an issue of formation, the court cannot be sure that the party resisting arbitration ever viewed the arbitrator as competent to resolve any dispute." *Id.* at 762. The same cannot be said where, as here, parties admittedly entered into a valid agreement with a binding arbitration clause, thereby indicating their willingness to arbitrate "at least certain disputes[.]" *Id.* Recognizing this distinction, a district court in this jurisdiction applied the *National Railroad Passenger Corp.* framework in a 2011 arbitrability dispute over contract termination and, consequently, compelled arbitration. *See Sheet Metal Workers' Int'l Ass'n*, 767 F. Supp. 2d at 173-175 (analyzing arbitrability of termination dispute and compelling arbitration).

This Court recognizes that the district judge to whom this matter was assigned prior to its transfer appeared to reach a different conclusion two years ago, when the court initially denied Liberty's motion to dismiss for lack of jurisdiction, noting that there were genuine issues of material fact regarding whether the parties had reached impasse. (*See* Minute Order, Aug. 30, 2012; *see also* Teleconf. Tr. at 7.) To the extent

that this Court's conclusion conflicts with prior suggestions that the question of impasse was for the court to decide, this Court now departs from that conclusion for at least two reasons. First, the court reached its first conclusion in a minute order on a motion to dismiss and without in-depth analysis of the law. *See, e.g.*, *Vander Malle v. Ambach*, 667 F. Supp. 1015, 1030 n.14 (S.D.N.Y. 1987) (noting that a prior decision on a motion to dismiss suggesting that the plaintiffs need not exhaust administrative remedies did not become "law of the case" barring reconsideration on renewed motions for summary judgment). Second, decisions implicating subject matter jurisdiction are less susceptible to law-of-the-case doctrine. *See Walsh v. McGee*, 918 F. Supp. 107, 112 (S.D.N.Y. 1996) (citation omitted); *see also* Charles Alan Wright et al., 18B Fed. Prac. & Proc. Juris. § 4478.5 (2d ed. 2014) ("If the ruling is avowedly tentative or the issues especially important, it may be said that law-of-the-case principles do not apply. . . . [M]atters of subject-matter jurisdiction . . . are most likely to be reconsidered because of their conceptual importance."). Finally, this Court is satisfied that a potentially contrary decision here will not prejudice the parties; although the prior decision led this case to proceed through discovery, the evidence gleaned during the course of this litigation may ultimately lead to a swifter decision during the arbitration process.

IV.    **CONCLUSION**

This Court concludes that it properly may exercise subject matter jurisdiction over MEBA's claims because they arise under section 301 of the LMRA. Moreover, whether the parties' CBA was still in place at the time of all of the alleged violations is a question that arises under the durational provision of the contract, and is therefore a question for the arbitrator to decide. Consequently, this Court **DENIES** Defendant's

motion for summary judgment and **GRANTS** Plaintiff's motion for summary judgment.

The Court will issue an order entering judgment for the Plaintiff and compelling the

parties to proceed to arbitration to resolve the Union's grievances.


DATE:  September 30, 2014                    Ketanji Brown Jackson
                                             KETANJI BROWN JACKSON
                                             United States District Judge